Peter R. Jarvis, OSB #761868
E-mail:peter.jarvis@hklaw.com
Nellie Q. Barnard, OSB # 122775
E-mail: nellie.barnard@hklaw.com
**HOLLAND & KNIGHT LLP**
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300
Fax:  503.241.8014

*Attorneys for Davis Wright Tremaine LLP and Mark
Hutcheson*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| ST. CHARLES HEALTH SYSTEM, INC., an Oregon nonprofit corporation, | Case No. 6:21-cv-00304-MC |
| Plaintiff, | |
| v. | DAVIS WRIGHT TREMAINE LLP AND MARK HUTCHESON'S OPPOSITION TO MOTION FOR SANCTIONS AND RESPONSE TO ORDER TO SHOW CAUSE |
| OREGON FEDERATION OF NURSES AND HEALTH PROFESSIONALS, LOCAL 5017, AFT, AFL-CIO, | ORAL ARGUMENT REQUESTED |
| Defendant. | |

DWT AND HUTCHESON'S OPPOSITION TO
SANCTIONS AND RESPONSE TO ORDER TO SHOW
CAUSE:  CASE NO. 6:21-CV-00304-MC

#84143722_v5

## <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION ................................................................................................1

II. BACKGROUND ................................................................................................2

    A. THE COVID-19 PANDEMIC ........................................................................2

    B. FEBRUARY 22, 2021: THE UNION SENT A STRIKE NOTICE AND ST. CHARLES BEGAN ITS EMERGENCY ANALYSIS ................................................................3

    C. FEBRUARY 23, 2021: DWT CONFERRED WITH THE UNION AND FILED A ULP CHARGE ...6

    D. FEBRUARY 24, 2021: THE NLRB STATES THAT IT CANNOT RESPOND BEFORE THE STRIKE ................................................................6

    E. FEBRUARY 25, 2021: ST. CHARLES FILED A STATE COURT TRO ...................7

    F. FEBRUARY 26, 2021: THE UNION REMOVED THE CASE AND THE COURT SET A HEARING AND BRIEFING SCHEDULE ................................................................8

    G. MARCH 1, 2021: THE UNION OPPOSED THE TRO ....................................9

    H. MARCH 1, 2021: ST. CHARLES FILED A REPLY SIX HOURS LATER ................9

    I. MARCH 1, 2021: ST. CHARLES ATTEMPTED TO SETTLE THE DISPUTE IN ADVANCE OF THE HEARING ................................................................11

    J. MARCH 2, 2021: THE COURT DENIED THE TRO FROM THE BENCH ..............11

    K. MARCH 4, 2021: ST. CHARLES VOLUNTARILY DISMISSED THE CASE AND THE STRIKE BEGAN ................................................................12

    L. MARCH 12, 2021: THE STRIKE ENDED NINE DAYS LATER ..........................12

    M. APRIL 7, 2021: THE NLRB SUBMITTED ST. CHARLES' ULP TO THE DIVISION OF ADVICE ................................................................12

III. ANALYSIS ................................................................................................13

    A. THERE IS NO BASIS FOR SANCTIONS AGAINST ST. CHARLES ......................13

    B. DWT MADE A COLORABLE ARGUMENT FOR AN INJUNCTION AND DID NOT ATTEMPT TO OBTAIN AN ILLEGAL ORDER ................................................................14

    C. DWT DID NOT INTEND TO MISLEAD THE COURT ....................................18

    D. DWT DID NOT VIOLATE ANY RPC OR 28 U.S.C. § 1927 ..........................20

IV. CONCLUSION ................................................................................................22

DWT AND HUTCHESON'S OPPOSITION TO SANCTIONS AND RESPONSE TO ORDER TO SHOW CAUSE: CASE NO. 6:21-CV-00304-MC

**HOLLAND & KNIGHT LLP**
601 SW Second Avenue, Suite 1800
Portland, OR 97204
Telephone: 503.243.2300

#84143722_v5

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Alexander v. F.B.I.*,
  541 F. Supp. 2d 274 (D.D.C. 2008) ..........................................................................14

*Am. Unites for Kids v. Rousseau*,
  985 F.3d 1075 (9th Cir. 2021) ................................................................................13

*Braunstein v. Ariz. Dep't of Transp.*,
  683 F.3d 1177 (9th Cir. 2012) ................................................................................22

*Byrne v. Nezhat*,
  261 F.3d 1075 (11th Cir. 2001) ........................................................................13, 14

*Eastway Constr. Corp. v. City of New York*,
  637 F. Supp. 558 (E.D.N.Y. 1986) ..........................................................................16

*M.E.N. Co. v. Control Fluidics, Inc.*,
  834 F.2d 869 (10th Cir.1987) ................................................................................13

*Malhiot v. S. California Retail Clerks Union*,
  735 F.2d 1133 (9th Cir. 1984) ................................................................................21

*N.L.R.B. v. Nash-Finch Co.*,
  320 F. Supp. 858 (D.C. Neb. 1969) ..........................................................................16

*In re Porto*,
  645 F.3d 1294 (11th Cir. 2011) ................................................................................13

*Pratt v. California*,
  11 Fed. Appx. 833 (9th Cir. 2001) ..........................................................................17

*In re Ruben*,
  825 F.2d 977 (6th Cir. 1987) ................................................................................13

*San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*,
  359 U.S. 236 (1959) ..........................................................................................*passim*

*Schmitzer v. Cty. of Riverside*,
  26 Fed. Appx. 701 (9th Cir. 2002) ..........................................................................21

*Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters*,
  436 U.S. 180 (1978) ........................................................................................10, 11

DWT AND HUTCHESON'S OPPOSITION TO
SANCTIONS AND RESPONSE TO ORDER TO SHOW
CAUSE:  CASE NO. 6:21-CV-00304-MC

**HOLLAND & KNIGHT LLP**
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

*State ex rel. Tidewater Shaver Barge Lines v. Dobson,*
  195 Or. 533, 245 P.2d 903 (1952) .......................................................................17, 18

*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of
  Am., AFL-CIO,*
  948 F.2d 1338 (2d Cir. 1991) ...................................................................................14

**Statutes**

28 U.S.C. § 1927 ................................................................................................*passim*

29 U.S.C. § 160(j) .............................................................................................*passim*

**Rules**

Oregon R. Prof. Conduct 3.3(a)(2) .................................................................................20

Oregon R. Prof. Conduct 3.3(d) .....................................................................................20

**Other Authorities**

Bradbury, Alexandra, "The Logic of Short Labor Strikes," Dec. 8, 2014 (available at
  https://labornotes.org/2014/12/logic-short-hospital-strikes) ........................................ 3

Eduardo Costa, "License to Kill? The Impact of Hospital Strikes." (Oct. 1, 2020)
  (available at https://academic.oup.com/cid/advance-article-
  abstract/doi/10.1093/cid/ciaa1373/5904791?redirectedFrom=fulltext) ...................... 5

Filip Jansåker, et. al., DACOBAN, "All-cause Mortality Due to Bacteremia during a
  60-Day Non-Physician Healthcare Worker Strike." *Clinical Infectious Diseases*,
  ciaa1373 (2020) (available at  https://doi.org/10.1093/cid/ciaa1373) ......................... 4

Gruber, Jonathan and Samuel A. Kleiner, "Do Strikes Kill? Evidence from New York
  State." NBER Working Paper Series, (Mar. 2012) (available at:
  https://www.nber.org/papers/w15855) ......................................................................... 4

NLRB Public Field Manual § 10050 ...............................................................................14

NLRB Public Field Manual § 11750.1 .............................................................................15

DWT AND HUTCHESON'S OPPOSITION TO
SANCTIONS AND RESPONSE TO ORDER TO SHOW
CAUSE:  CASE NO. 6:21-CV-00304-MC

**HOLLAND & KNIGHT LLP**
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

## I.    INTRODUCTION

This Memorandum is submitted in response to both Defendant's Motion for Sanctions (Dkt. 20) ("Sanctions Motion") and this Court's April 7, 2021 Order to Show Cause ("Show Cause Order") (Dkt. 24).  Davis Wright Tremaine and Mark Hutcheson (collectively "DWT") respectfully submit that no sanctions are warranted against either Plaintiff St. Charles Health System, Inc. ("St. Charles") or its counsel.

DWT welcomes the opportunity to explain to the Court what it did and why it did so. As explained below, DWT was faced with a need for virtually immediate action in the midst of a pandemic when both DWT and its client believed that inaction would lead to serious consequences to St. Charles' patients.  DWT never intended to conceal any pertinent authority from opposing counsel or the Court and did not assert what it thought then or thinks now was a legally frivolous argument.  With the benefit of hindsight, however, DWT recognizes that it should have done more to preemptively explain why Section 10(j) and *Garmon* preemption did not preclude DWT from asking the Court to grant the relief requested in the TRO Motion.

In the middle of a once-in-a-century pandemic, Defendant Oregon Federation of Nurses and Health Professionals, Local 5017, AFT, AFL-CIO (the "Union" or "OFNHP") called a strike of indefinite duration during negotiation for a first contract with St. Charles.  Because DWT (like St. Charles) believed then, as it does today, that the Union's strike notice violated federal labor law, DWT filed an unfair labor practice ("ULP") charge on behalf of St. Charles and asked the National Labor Relations Board ("NLRB") to issue a complaint and then seek an injunction to stop the strike under 29 U.S.C. § 160(j) (also referred to as Section 10(j)).  Unfortunately, the NLRB responded by informing St. Charles that it would not be able issue a decision on the merits of the ULP before the strike commenced—not because of any expressed doubt on the merits of DWT's assertions, but because of a backlog of other matters.  To make matters worse, St. Charles had also been informed by state licensing authorities that they would not be able to certify a sufficient number of out-of-state replacement workers in time, requiring St. Charles to contemplate delaying or canceling potentially

Page - 1    DWT AND HUTCHESON'S OPPOSITION TO
SANCTIONS AND RESPONSE TO ORDER TO SHOW
CASE:  CASE NO. 6:21-CV-00304-MC

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

life-saving medical treatments for patients in need.  Second Declaration of Rebecca Berry In Support of St. Charles' Opposition to Motion for Sanctions ("Second Berry Decl.") ¶ 5. Faced with this impossible situation, DWT concluded that it was legally permissible to seek temporary judicial relief to protect the health and safety of Oregon's patients and to maintain the *status quo* until the NLRB could act on St. Charles' ULP.  DWT and St. Charles thus turned to the courts for a temporary remedy only after the NLRB explicitly advised that it could not determine whether the strike was lawful before the strike would begin, and only because of a good faith belief that serious and irreparable public harm would result if the strike occurred as planned.  DWT and St. Charles believed in good faith that a court sitting in equity could delay the strike pending NLRB review in the interest of public health and safety

In short, the circumstances were unprecedented, extraordinary and time-sensitive with the potential for significant harm if no action was taken and, as noted below, in the context of a gap in the case law that DWT believed (and still believes) did not foreclose the legal argument that it made. Sanctions are not warranted under either 28 U.S.C. § 1927 or the Court's inherent authority.

## II.    BACKGROUND

### A.    The COVID-19 Pandemic

This case was filed as a result of the COVID-19 pandemic.  As we are all aware, a novel coronavirus first detected in late 2019 has spread across the globe, killing millions of individuals worldwide and hundreds of thousands within the United States.  It has altered our way of life in ways that were previously unimaginable, with no community (including Central Oregon) left untouched.  In March 2020, Governor Brown declared a state of emergency and began issuing executive orders to respond to the threat posed by the virus and the illness it causes, COVID-19.  Although the crisis may now be abating in other parts of the Country, in Deschutes County it is very much still a matter of present rather than past concern.

In Central Oregon as throughout the rest of the United States, the healthcare system has borne an extraordinary burden in fighting this insidious disease.  Although vaccines have now been developed, tested, and administered to many Oregonians and others in record time, neither Central

Page - 2    DWT AND HUTCHESON'S OPPOSITION TO
SANCTIONS AND RESPONSE TO ORDER TO SHOW
CAUSE:  CASE NO. 6:21-CV-00304-MC

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

Oregon nor any other part of the state or country could say at the time of the underlying events in this case (or today) that the pandemic has passed. As the Court is no doubt aware and can take judicial notice, Oregon is still in the midst of yet another unprecedented surge, with Deschutes County bearing a disproportional impact. And as the Court also is no doubt aware and can take judicial notice, the pandemic has created a secondary health crisis in the backlog of patients who had to defer care that they needed—whether to clear the way for COVID-19 patients or out of fear of catching the virus.

St. Charles has a long and almost entirely strike-free relationship with its nurses' union. Shortly in advance of the COVID-19 backdrop, a different union, OFNHP, sought to organize roughly 150 technical caregivers at the St. Charles campus in Bend, Oregon. These technical caregivers include all catheterization laboratory technologists, certified surgical technologists, CT technologists, echo technologists, nuclear med technologists, neurodiagnostic technologists, radiologic technologists, radiation therapy technologists, respiratory therapists, surgical technologists, ultrasound technologists, vascular/catheterization technologists, and x-ray technologists. Declaration of Rebecca Berry in Support of Plaintiff's Motion for Temporary Restraining Order and Order to Show Cause why Preliminary Injunction Should Not Issue ("Berry Decl.") ¶ 2 (Dkt. 11). The Union was certified following an election. St. Charles and the Union commenced negotiations for a first contract in January 2020. Although negotiations were twice paused during COVID-19 surges, the parties were ultimately able to reach a complete agreement at the end of March 2021. Unfortunately, the present matter arose during the period before this agreement was reached.

### B.    February 22, 2021:  The Union Sent a Strike Notice and St. Charles Began its Emergency Analysis

At 7:48 am on February 22, 2021, the Union served a 10-day notice that it would "engage in a strike, picket, and other protected concerted activity at St. Charles Bend" at 8 a.m. on March 4, 2021. Declaration of David Stylianou in Opposition to Plaintiff's Motion for Temporary Restraining Order ("Stylianou Decl.") Ex. 12 (Dkt. 13-12). Unlike many strikes in health care where the strike notice includes a defined period of one or a few days, this strike notice was for an indefinite duration. *Id.*;

Page - 3    DWT AND HUTCHESON'S OPPOSITION TO
SANCTIONS AND RESPONSE TO ORDER TO SHOW
CAUSE:  CASE NO. 6:21-CV-00304-MC

**HOLLAND & KNIGHT LLP**
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

*see, e.g.*, Bradbury, Alexandra, "The Logic of Short Labor Strikes," Dec. 8, 2014 (available at https://labornotes.org/2014/12/logic-short-hospital-strikes) ("And most often health care strikes aren't open-ended: the union announces in advance the strike will last one day, or two."). The strike notice was not anticipated by St. Charles. The parties had reached tentative agreements on many subjects by December 2020. The open issues were primarily limited to wages in the second and third year of the contract and union membership. In order to facilitate resolution of all issues, St. Charles proposed the use of a federal mediator to assist in negotiating these final terms. The Union initially refused to engage the services of a mediator, but on February 2, 2021, agreed to do so. Stylianou Decl. Exs. 6 at 1, 10 at 7 (Dkt. Nos. 13-6 at 1, 13-10 at 7). The parties scheduled the first day with the mediator on March 10, the earliest date that worked for all participants. The February 22 strike notice was delivered after the March 10 meeting had been scheduled. Declaration of Paula L. Lehmann In Support of Davis Wright Tremaine LLP and Mark Hutcheson's Opposition to Motion For Sanctions and Response to Order to Show Cause ("Lehmann Decl.") ¶ 2.

As noted in St. Charles' Opposition to Motion for Sanctions, St. Charles immediately had to shift its focus away from COVID-related issues in order to assess and mitigate the effects of the threatened strike. St. Charles anticipated that nearly all of the 150 newly-unionized technical caregivers at its Bend Campus would participate in the strike. Berry Decl. ¶ 2. Without these technical caregivers, St. Charles would not be able to provide essential and critical medical care at its Bend campus. *Id.* at ¶¶ 3, 8, 9.

St. Charles is the region's primary trauma center. Berry Decl. ¶ 8. Even under non-pandemic conditions, hospital strikes are known to cause an increase in hospital mortality, readmission, and other adverse consequences to patients.[1] Given St. Charles' referral status and the lack of similarly-equipped

---

[1] *See* Gruber, Jonathan and Samuel A. Kleiner, "Do Strikes Kill? Evidence from New York State." NBER Working Paper Series, (Mar. 2012) (available at: https://www.nber.org/papers/w15855) ("nurses' strikes increase in-hospital mortality by 19.4% and 30-day readmission by 6.5% for patients admitted during a strike, with little change in patient demographics, disease severity or treatment intensity"); Filip Jansåker, et. al., DACOBAN, "All-cause Mortality Due to Bacteremia during a 60-Day Non-Physician Healthcare Worker Strike." *Clinical Infectious Diseases*, ciaa1373 (2020)

Page - 4     DWT AND HUTCHESON'S OPPOSITION TO
SANCTIONS AND RESPONSE TO ORDER TO SHOW
CAUSE:  CASE NO. 6:21-CV-00304-MC

**HOLLAND & KNIGHT LLP**
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

hospitals in Central and Eastern Oregon, St. Charles believed that its inability to provide services via the 150 technical caregivers for an unknown and possibly extended period of time would have serious health impacts for the community under even normal conditions.  Berry Decl. ¶¶ 8–11. And under pandemic conditions, the consequences could and would likely be far worse.  *Id*. DWT had no reason to believe otherwise.

Under normal and non-pandemic circumstances, St. Charles could and would pursue replacement workers who could travel to Bend from other locations in Oregon or perhaps other states to provide continuity of care or, in other words, to keep patient-care uninterrupted.  Berry Decl. ¶ 8. In this case and under these circumstances, Oregon did not have sufficient replacement workers. *Id*. at ¶¶ 8, 9.  Moreover, many if not all of the replacement workers from outside Oregon would require certifications from the Oregon Board of Medical Imaging, adding serious additional burdens and constraints that had to be addressed in order to meet the challenges of a technical worker strike.  *Id*. These out-of-state replacement workers would also need housing.  *Id*. at ¶ 8.  The impact on the community was also intensified because St. Charles had had to ration surgical and procedural care throughout the pandemic. *Id*. Consequently, individuals seeking care from St. Charles at the time of the strike were often in worse health and would need more attention than under normal conditions.  *Id*. St. Charles was also very concerned about the impact on St. Charles' patients who could not seek care elsewhere and about the additional stress that operating under such conditions would place on the rest of its already COVID-fatigued caregivers.  Second Declaration of Rebecca Berry In Support of St. Charles' Opposition to Motion for Sanctions ("Second Berry Decl.") ¶ 4.  DWT did not doubt the hospital's views.

---

(available at   https://doi.org/10.1093/cid/ciaa1373) ("a significant increase in all-cause 90-day mortality was found in patients diagnosed with bacteremia during the 60-day non-physician healthcare worker strike compared to the rest of the period 2000–2015…. The findings indicate that vulnerable groups of patients need extra attention during strikes."); Eduardo Costa, "License to Kill? The Impact of Hospital Strikes." (Oct. 1, 2020) (available at https://academic.oup.com/cid/advance-article-abstract/doi/10.1093/cid/ciaa1373/5904791?redirectedFrom=fulltext) (finding a 6% increase in hospital mortality for patients exposed to physicians' strikes).

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

C.    **February 23, 2021: DWT Conferred with the Union and Filed a ULP Charge**

On February 23, 2021, DWT asked the Union for evidence that it had provided a mandatory Federal Mediation and Conciliation Service ("FMCS") 30-days-notice under Section 8(d)(B), and if not, to withdraw the notice.  Lehmann Decl. Ex. A.  Later that morning, the Union provided a September 2019 FMCS notice.  *Id*.  In DWT's opinion, the 2019 FMCS notice did not constitute proper notice under Section 8(d)(B) for a 2021 strike. DWT therefore filed an unfair labor practice charge (a "ULP") with the NLRB on behalf of St. Charles—the day after receiving the strike notice, nine-days before the strike was scheduled to begin. Berry Decl. Ex. 2.  The ULP alleged that the Union issued a "non-compliant 8(g) notice for a strike of indefinite duration to commence on March 4" because it "failed to provide the mandatory 30 day notice of dispute under Section 8(d)(B) to FMCS or the appropriate state agency." *Id*.  St. Charles also sought "immediate 10j relief to prevent the strike until proper notice is given." *Id*.  Simultaneously, St. Charles rapidly explored all options to find qualified replacement workers and develop contingency plans for patient protection if replacements could not be found. *Id*. at ¶¶ 8, 9 11.

D.    **February 24, 2021: The NLRB States That it Cannot Respond Before the Strike**

On the morning of February 24, 2021, DWT emailed the NLRB to discuss whether and how the Board could support St. Charles in seeking injunctive relief.  Lehmann Decl. ¶ 4.  DWT later spoke by phone with Jessica Dietz, the officer in charge of the NLRB Portland office.  *Id*.  Ms. Dietz stated that the Region would not be able to resolve the issues raised by the charge before the impending March 4, 2021 strike.  *Id*. Ms. Dietz also explained that due to the number of pending cases, it was taking weeks to address pending Section 10(j) cases.  *Id*.

Faced with both the impossibility of obtaining timely relief from the NLRB and the impossibility of fully mitigating and addressing the harms that could be caused by the strike, DWT considered judicial relief.  Lehmann Decl. ¶ 5.  DWT believed there was a good faith basis for seeking temporary relief until the NLRB could act, especially in light of the potential harm to public health and safety. Neither DWT nor St. Charles sought injunctive relief in order to gain an advantage in the

Page - 6      DWT AND HUTCHESON'S OPPOSITION TO
SANCTIONS AND RESPONSE TO ORDER TO SHOW
CAUSE:  CASE NO. 6:21-CV-00304-MC

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

ongoing bargaining with the Union. *Id.* A lawful strike could be noticed at any time provided the Union gave the requisite statutory notice, which would have allowed St. Charles time to ensure uninterrupted patient care.

      **E.**      **February 25, 2021: St. Charles Filed a State Court TRO**

      On February 25, 2021 at about 4:30 pm—in other words, about 80 hours after receiving the strike notice and about 24 hours after learning from the NLRB that it could not avert the strike—St. Charles filed a complaint and Plaintiff's Motion for Temporary Restraining Order and Order to Show Cause why Preliminary Injunction Should Not Issue in Deschutes County Circuit Court seeking injunctive relief (the "TRO Motion"). Dkt. 10. The TRO Motion sought to "[t]emporarily restrain" the Union "from striking, pending resolution of the currently pending charge before the National Labor Relations Board" and to require the Union "to show cause, if any, why the Court could not grant a preliminary injunction to maintain the status quo while the parties seek resolution before the NLRB." TRO Motion at 1. Far from concealing its contacts with the NLRB or the general authority of the NLRB, DWT explained in the TRO Motion that it had filed a ULP with the NLRB, but that "it is not possible for the NLRB to act quickly enough to prevent the strike" and it thus sought "a temporary restraining order prohibiting any striking activity until the board is able to reach a decision on this unfair labor practice charge and take appropriate action." *Id.* at 5. As St. Charles further explained in a supporting declaration, "[t]he NLRB has advised St. Charles that the charge will not be resolved prior to the March 4, 2021 strike date." Berry Decl. ¶ 7.

      In analyzing the standard for a TRO, DWT explained that the "NLRB is tasked with determining whether [the Union] complied with all notice requirements in issuing its March 4 strike notice." TRO Mot. at 7. After analyzing why the strike notice was defective, DWT explained to the Court that "given the tight timeframe imposed by the [Union's] non-compliant strike notice, it is unlikely the NLRB will be able to issue a ruling before the noticed strike date. An injunction here is St. Charles's only opportunity to avoid irreparable harm." TRO Mot. at 9. On the threat of continuing harm prong, DWT explained, "The NLRB will determine when [the Union] is legally permitted to

Page - 7      **DWT AND HUTCHESON'S OPPOSITION TO**
                  **SANCTIONS AND RESPONSE TO ORDER TO SHOW**
                  **CAUSE: CASE NO. 6:21-CV-00304-MC**

**HOLLAND & KNIGHT LLP**
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

strike.  If [the Union] is permitted to commence its strike *before* the NLRB is able to issue its injunction, there is the potential for serious harm to the community." *Id*. at 9–10 (emphasis in original).  On the irreparably injury prong, DWT argued "this injunction is the *only* way to ensure that the proper authority, the NLRB, is able to consider the rule on this issue before actual harm is caused by the threatened strike." *Id*. at 10 (emphasis in original).  Finally, in arguing to preserve the status quo, DWT asserted that:

> St. Charles is not seeking a permanent injunction, nor does it claim that workers cannot strike during a pandemic. To the contrary, St. Charles recognizes caregivers' right to engage in lawful strike activity <u>and the authority of the NLRB over the notice issue raised here.</u> St. Charles is simply asking that this Court <u>ensure that the proper adjudicating body is able to complete its review and issue its decision in a meaningful way before the irreparable harm that would be caused by this (illegal) strike occurs.</u> By issuing an injunction this Court ensures that patient care will not be compromised while the NLRB considers the issue.

*Id*. at 10 (emphasis added).  In other words, DWT expressly acknowledged the NLRB's broad general authority over labor disputes and sought a temporary state court injunction only after learning from the NLRB that it could not act in time and only for the period before the NLRB would act.

## F.    February 26, 2021: The Union Removed the Case and the Court Set a Hearing and Briefing Schedule

On Friday, February 26, 2021, the Union's counsel removed the case to this Court. Dkt. 1.  St. Charles then filed a 2-page list of supplemental authorities in this Court in support of its contention that the strike notice was defective in order to meet the "likelihood of success" component for a TRO. Dkt. 2.  In an email to the Court that included counsel for the Union later that day, DWT requested a hearing for that afternoon or in the alternative, a scheduling conference.  Declaration of Catherine Highet In Support of Motion for Imposition of Sanctions ("Highet Decl.") Ex. 1 (Dkt. 21-1).

DWT did not intend to prevent the Union from filing an opposition by requesting a same-day hearing. DWT simply wished as soon as possible to obtain relief that would allow St. Charles to focus on critically needed patient care during the pandemic until the legality of the strike notice could be

Page - 8    DWT AND HUTCHESON'S OPPOSITION TO SANCTIONS AND RESPONSE TO ORDER TO SHOW CAUSE:  CASE NO. 6:21-CV-00304-MC

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

decided by the NLRB. DWT did not doubt that the Court could and would give the Union an opportunity to be heard before it made a decision. Lehmann ¶ 6.

The Union objected to having a hearing that afternoon. Highet Decl. Ex. 1. The Court set a hearing for 9 am on Tuesday March 2, 2021 and gave the Union until 9 am on Monday March 1 to file its opposition to the TRO Motion. *Id.*

### G.    March 1, 2021: The Union Opposed the TRO

On March 1, 2012, the Union filed its opposition to the TRO ("the Opposition"). Dkt. 12. Insofar as the present controversy is concerned, the key premise of the Opposition was that St. Charles was asking this Court to step in when the NLRB *would not* act: "having failed to convince the Board to seek an injunction in this case, St. Charles does so itself" but without "explain[ing] why the Board's exclusive control does not block St. Charles' attempt." Def.'s Opp. TRO Mot. at 1 (Dkt. 12). *See also id.* at 4 ("St. Charles asked the NLRB for 'immediate 10j relief.' *Id.* The NLRB has so far declined. Docket No. 1-1, p. 21, ¶ 7."); *id.* at 8 ("St. Charles asked the Board to pursue injunctive relief under Section 10(j). Docket No. 1-1, p. 26, item #2. The Board has not done so. Therefore, no injunctive relief is available."). Without in any way questioning the right of the Union's counsel to engage in this form of advocacy as a characterization of prior events, it is not a full or fair interpretation. To the contrary, the NLRB had informed St. Charles that it *could not* act before the March 4 strike. Berry Decl. ¶ 7 ("[t]he NLRB has advised St. Charles that the charge will not be resolved prior to the March 4, 20201 strike date."). Thus, DWT, on behalf of St. Charles, sought a TRO only until such time as the NLRB could decide whether and how to act. TRO Mot. at 1.

### H.    March 1, 2021: St. Charles Filed a Reply Six Hours Later

In its Reply in Support of the TRO Motion (the "TRO Reply") filed just six hours later (since the hearing was scheduled for the next day), DWT argued that the Union misunderstood the TRO Motion because St. Charles "does not intend to 'request[] what the [National Labor Relations Act] forbids.' Opp. at 8. As addressed below, local courts retain the ability to issue an injunction in the circumstances presented here." TRO Reply at 2 (Dkt. 14). DWT went on to argue in Section C of the

Page - 9     DWT AND HUTCHESON'S OPPOSITION TO
SANCTIONS AND RESPONSE TO ORDER TO SHOW
CAUSE:  CASE NO. 6:21-CV-00304-MC

TRO Reply that St. Charles was "not asking this Court to supplant the Board's role in ruling on the merits of the underlying dispute. To the contrary, [St. Charles] is merely asking that Court temporarily enjoin the strike to allow the Board with the additional time needed to make its determination. Federal labor law does not preclude this Court from issuing this type of injunctive relief." *Id*. at 10–11.

DWT then acknowledged "*Garmon* preemption," in which the Supreme Court made clear that "[w]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board." *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon,* 359 U.S. 236, 245 (1959).  However, decades later in *Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters*, 436 U.S. 180 (1978), the Supreme Court explained that *Garmon* preemption is not absolute:

> While the *Garmon* formulation accurately reflects the basic federal concern with potential state interference with national labor policy, the history of the labor preemption doctrine in this Court does not support an approach which sweeps away state-court jurisdiction over conduct traditionally subject to state regulation without careful consideration of the relative impact of such a jurisdictional bar on the various interests affected. As the Court noted last Term:
>
> > "Our cases indicate . . . that inflexible application of the doctrine is to be avoided, especially where the State has a substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme." *Farmer v. Carpenters*, 430 U.S. 290, 302, 97 S.Ct. 1056, 1064, 51 L.Ed.2d 338 [(1977)].

*Sears*, 436 U.S. at 188 (footnote omitted).

DWT's theory was as follows:

> there is virtually no risk of interfering with the Board's effective administration of the NLRA; rather, [St. Charles] seeks to preserve the Board's ability to do so. …Because the Board has said it will not be able to rule one way or the other before the March 4 work stoppage commences—and therefore will not be able to seek an injunction in federal court under 29 U.S.C. § 160(j), if it decides in favor the Medical Center and issues a complaint—the Medical Center is merely asking to maintain the status quo, consistent with statute's plain language and Congress' intent, until such time as the NLRB resolves the underlying issue. That is all.

TRO Reply at 11–12.

Page - 10    DWT AND HUTCHESON'S OPPOSITION TO SANCTIONS AND RESPONSE TO ORDER TO SHOW CAUSE:  CASE NO. 6:21-CV-00304-MC

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

DWT also argued that the State of Oregon's substantial interest in the health and safety of its citizens during the ongoing global COVID-19 pandemic was just the sort of interest that the Supreme Court said could and should give rise to a flexible application of *Garmon* preemption. TRO Reply at 12 ("the State's interest in injunctive relief is particularly acute where, as here, the court is dealing with 'traditionally local matters [such] as public safety.'") (quoting *Sears*, 436 U.S. at 221); *id.* ("[t]he country is in the midst of a pandemic, and the public health and safety of the entire community will be put in harm's way due to the challenges [St. Charles] is facing in transferring patients to other facilities and in finding duly licensed replacements."); *id.* at 12–13 (the Union "fails to recognize that the preemption principles upon which it relies are not absolute. [St. Charles] recognizes that the NLRB has jurisdiction to decide the merits of the underlying issue, which is why it filed a ULP.")

I.    **March 1, 2021: St. Charles Attempted to Settle the Dispute in Advance of the Hearing**

In addition to preparing witnesses for the evidentiary portion of the hearing, Mark Hutcheson spent much of the day and evening before the March 2 hearing assisting with negotiations through Union counsel, Samuel Lieberman, in an effort to resolve the dispute and obviate the need for the hearing. Declaration of Mark Hutcheson In Support of Davis Wright Tremaine LLP and Mark Hutcheson's Opposition to Motion For Sanctions and Response to Order to Show Cause ("Hutcheson Decl.") ¶ 4. The negotiations went into the early hours of the morning. *Id.* For example, the last email Mr. Hutcheson exchanged with Mr. Lieberman was at about 2:30 am Pacific. Hutcheson Decl. ¶ 4. Unfortunately, the parties were not successful in settling the dispute at that time. *Id.*

J.    **March 2, 2021: The Court Denied the TRO from the Bench**

Mr. Hutcheson slept for a few hours and then resumed preparations for the 9 am hearing on March 2. Hutcheson Decl. ¶ 5. Mr. Hutcheson concedes that given his lack of sleep, he was not at his best. *Id.* Mr. Hutcheson does not offer this information as an excuse for what frustrated the Court, but as part of the context of which the Court might not otherwise have been aware. *Id.*

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

When asked by the Court to recall the facts of the *Sears* case on which DWT relied, Mr. Hutcheson was unable to do so.  TR 7:19–20 (Dkt. 17).  He was, however, able to recite the premise for which the case was cited by DWT in its reply brief—that "inflexible application of [*Garmon*] is to be avoided, especially where the State has a substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme."  TR 7:21–8:1 (quoting *Garmon*, 436 U.S. at 188).

The Court denied St. Charles' TRO Motion on the record, stating "the court does not have authority, it's solely with the NLRB." TR at 16:21–22.

**K.    March 4, 2021: St. Charles Voluntarily Dismissed the Case and the Strike Began**

On March 4, 2021, St. Charles voluntarily dismissed the case. Dkt. 18.  Also on March 4, the technical caregivers began their strike as planned.

**L.    March 12, 2021: The Strike Ended Nine Days Later**

On March 12, 2021, the parties, with the help of the federal mediator, negotiated a return to work agreement that ended the strike. Lehmann ¶ 7.

As a result of the strike, St. Charles was forced to contemplate canceling or postponing certain elective and complicated surgeries that patients had scheduled months before – all at a time in which St. Charles was facing a backlog of thousands of procedures due to the COVID-19 pandemic. Second Berry Decl. ¶ 5.  In the end, the strike cost St. Charles millions of dollars in replacement labor, forced St. Charles to find and train staff for high-risk emergency surgeries as well as elective procedures that had been long-scheduled due to a nearly insurmountable backlog caused by the COVID-19 pandemic, and resulted in patients raising concerns related to the conduct and disturbances of those on the picket line. *Id*.

**M.    April 7, 2021: The NLRB Submitted St. Charles' ULP to the Division of Advice**

On April 7, 2021, the NLRB regional office tasked with reviewing St. Charles' ULP charge submitted it to its Division of Advice ("Advice") for consideration.  The Division of Advice in Washington, D.C. provides guidance to the NLRB's General Counsel and to the Regional Offices with

Page - 12    DWT AND HUTCHESON'S OPPOSITION TO
SANCTIONS AND RESPONSE TO ORDER TO SHOW
CAUSE:  CASE NO. 6:21-CV-00304-MC

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

respect to difficult or novel legal issues raised in ULP charges. Advice determines whether a charge has merit and, if so, what legal theories should be advanced in support. St. Charles' charge remains pending with Advice as of the date of this filing. Lehmann Decl. ¶¶ 8, 9.

## III.    ANALYSIS

### A.    There is No Basis For Sanctions Against St. Charles

The Union seeks sanctions pursuant to the Court's inherent authority against St. Charles alone "for knowingly misleading this court about the court's authority to issue a Temporary Restraining Order at St. Charles's request." Sanctions Mot. at 2. To the extent sanctions are warranted against anyone (and DWT maintains that they are not), they are not warranted against St. Charles.

A district court has inherent authority to impose sanctions for bad faith. "Bad faith" means "conduct done vexatiously, wantonly, or for oppressive reasons, [and] requires proof of bad intent or improper purpose." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1090 (9th Cir. 2021). Moreover, impermissible conduct by DWT cannot be used to infer impermissible conduct by St. Charles. *See, e.g.*, *In re Porto*, 645 F.3d 1294, 1304 (11th Cir. 2011) ("While a client may be made to suffer litigation losses because of her attorney's missteps, [we] reject[] the notion that an innocent client must also suffer sanctions because of misconduct by her attorney that is not fairly attributable to her. Without more, the rule that the sins of the lawyer are visited on the client does not apply … and a court must specify conduct of the plaintiff herself that is bad enough to subject her to sanctions"); *Byrne v. Nezhat*, 261 F.3d 1075, 1123 (11th Cir. 2001) *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ("Sanctionable conduct by a party's counsel does not necessarily parlay into sanctionable conduct by a party"); *In re Ruben*, 825 F.2d 977, 986 (6th Cir. 1987) ("[i]f there was any fault in this regard, it lay with the attorneys and [plaintiff] should not be penalized for their misdeeds, if any") (citations omitted); *M.E.N. Co. v. Control Fluidics, Inc.*, 834 F.2d 869, 873 (10th Cir.1987) ("Where sanctions are concerned, ... we have cautioned that '[i]f the fault lies with the attorneys, that is where the impact of the sanction should be lodged.' " (citation omitted)).

Page - 13    DWT AND HUTCHESON'S OPPOSITION TO SANCTIONS AND RESPONSE TO ORDER TO SHOW CAUSE:  CASE NO. 6:21-CV-00304-MC

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

Nonetheless, that is what the Union's motion seeks to do here.  The Union asserts that because St. Charles had highly competent counsel, St. Charles must have understood that the argument that it was making was frivolous or vexatious.  Sanctions Mot. at 13 ("St. Charles is represented by extremely experienced and competent counsel.").[2]  The Union also argues that the Court can infer St. Charles' intent to mislead from the fact that it did not withdraw its request for injunctive relief and instead asserted that there was a basis for its motion.  *Id.* at 14. That is a thin reed on which to rest inherent authority sanctions, and it is just as supportive of the view that St. Charles believed that there was a legitimate basis for the TRO.  More importantly, and as discussed in more detail below, the arguments presented by DWT (and on which St. Charles necessarily relied) are neither frivolous nor vexatious.[3]

## B.    DWT Made a Colorable Argument For an Injunction and Did Not Attempt to Obtain an Illegal Order

To understand DWT's argument for an injunction, it is helpful to begin with an overview of the Unfair Labor Practice ("ULP") process.  A ULP is a charge alleging a violation of the National Labor Relations Act ("NLRA").  Once a ULP is filed, it is assigned to an NLRB field investigator. The field investigator makes a recommendation to the Regional Director whether to issue a formal complaint or to dismiss the charge after an investigation that usually includes interviewing witnesses

---

[2] The Union also argued that "this is the second time in the past year that Davis Wright Tremaine has sought injunctive relief for an allegedly faulty strike notice."  Sanctions Mot. at 13.  That assertion is incomplete and misleading.  Although DWT had filed a complaint seeking injunctive relief against a threatened strike in Alaska as the pandemic descended, the parties resolved the dispute without the need for judicial relief, so the court there never had to act on the complaint and the case closed without further briefing.  *See* United State District Court for the District of Alaska Case No. 3:20-cv-00067 (D. Alaska 2020).

[3] Although the Show Cause Order seeking an analysis under 28 U.S.C. § 1927 is directed to Mr. Hutcheson, we note for the sake of completeness that sanctions against St. Charles would be improper under that statute. By its terms, § 1927 "does not provide for the imposition of sanctions against parties." *Alexander v. F.B.I.*, 541 F. Supp. 2d 274, 299 (D.D.C. 2008); *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991) ("awards pursuant to § 1927 may be imposed only against the offending attorney; clients may not be saddled with such awards."); *Byrne*, 261 F.3d at 1106 (11th Cir. 2001).

DWT AND HUTCHESON'S OPPOSITION TO
SANCTIONS AND RESPONSE TO ORDER TO SHOW
CAUSE:  CASE NO. 6:21-CV-00304-MC

**HOLLAND & KNIGHT LLP**
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

and examining documents.  NLRB Public Field Manual § 10050.[4]  If the Regional Director determines an unfair labor practice has been committed, the Regional Director issues a formal complaint, which triggers a hearing before an administrative law judge.[5]

If and when a decision to issue a complaint is made, Section 10(j) authorizes the Regional Director to determine whether a preliminary injunction is also warranted.  Section 10(j) states:

> The Board shall have power, *upon issuance of a complaint* as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j) (emphasis added.)  In other words, the plain language of the statute requires that the NLRB first determine that a ULP charge has merit and then issue a complaint before it can seek injunctive relief.  Put differently, the "issuance of a complaint" is a prerequisite that must be satisfied before the NLRB "shall have the power" to seek an injunction.

In this case, the NLRB stated that it could not complete its investigation before the strike commenced.  The NLRB would thus not be able to issue a complaint and, therefore, seek an injunction under Section 10(j) to stop the strike from going forward, even if the NLRB subsequently concludes that the strike was unlawful. Under the Union's interpretation of Section 10(j) and *Garmon* preemption, the NLRB's inability to immediately address the merits of St. Charles' ULP resulted in a law-free zone in which St. Charles had no legal recourse for as long as it would take the NLRB to act. That reality, coupled with St. Charles' inability to secure sufficient replacement workers in the midst

---

[4] Available at https://www.nlrb.gov/sites/default/files/attachments/pages/node-174/ulp-manual-april-2021.pdf.

[5] A third possibility may also arise in cases involving novel, complex, or difficult legal issues. NLRB Public Field Manual § 11750.1. In such cases, the Regional Director can submit the matter to the Division of Advice to help determine whether additional investigatory steps are required or whether a Complaint should issue.

Page - 15    DWT AND HUTCHESON'S OPPOSITION TO SANCTIONS AND RESPONSE TO ORDER TO SHOW CAUSE:  CASE NO. 6:21-CV-00304-MC

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

of a once-in-a-lifetime pandemic and during a strike of indefinite duration, posed a significant threat to the well-being of St. Charles' patients.[6]

Based on these facts, and in the absence of all-fours Supreme Court authority to the contrary, a reasonably prudent lawyer could non-frivolously and non-vexatiously conclude that the NLRB's exclusive jurisdiction had not yet vested.[7] That is what Mr. Hutcheson and DWT concluded. Hutcheson Decl. ¶ 6. If, in fact, the NLRB had sought an injunction *before* issuing a complaint, the Union would have been entitled to insist that it be vacated on the basis that any relief granted would be procedurally infirm. *See, e.g.*, *N.L.R.B. v. Nash-Finch Co.,* 320 F. Supp. 858, 863 (D.C. Neb. 1969), *reversed on other grounds by* 404 U.S. 138 (1971) ("for this Court to entertain a request for relief in a 10(j) proceeding, there must exist, as a prerequisite to the Board's application, a complaint which has as its basis the activities in question."). A reasonably prudent lawyer could further conclude that, particularly in the middle of a once-in-a-century pandemic, courts could or would be willing to step in and avoid leaving a health care provider such as St. Charles in a legal state of limbo in which it was even temporarily powerless to prevent unlawful activity that would severely and irreparably harm patients. That too is what Mr. Hutcheson and DWT concluded. Hutcheson Decl. ¶ 6. Although the NLRB can sanction a union after the fact, that remedy would be too little and too late for all whose healthcare was adversely impacted.[8]

---

[6] As noted above, the NLRB referred the dispute to the Division of Advice for consideration, which is consistent with DWT's determination that the ULP charge is well taken and certainly not frivolous.

[7] First amendment free speech rights, which extend to arguments made before a court, are another reason sanctions should be reserved for only situations in which the litigation is a sham, which is not the case here. *See, e.g.*, *Eastway Constr. Corp. v. City of New York*, 637 F. Supp. 558, 575 (E.D.N.Y. 1986), *order modified and remanded*, 821 F.2d 121 (2d Cir. 1987) (filed cases "publicize grievances and thus permit the ventilation of private outrage that the First Amendment's right to petition protects … . Many civil rights cases fall into this category. So, too, do many prisoner habeas corpus cases … .Sometimes there are reasons to sue even when one cannot win. Bad court decisions must be challenged if they are to be overruled, but the early challenges are certainly hopeless.").

[8] St. Charles subsequently entered into a return to work agreement which affirmed that all strikers would return to work without discipline. Second Berry Decl. ¶ 6.

DWT AND HUTCHESON'S OPPOSITION TO SANCTIONS AND RESPONSE TO ORDER TO SHOW CAUSE: CASE NO. 6:21-CV-00304-MC

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

If there truly is an all-fours case on these facts, neither Union counsel, nor DWT, nor the undersigned have found it.  And as noted in *Pratt v. California*, 11 Fed. Appx. 833, 835 (9th Cir. 2001), "[a] filing is frivolous if it is both baseless and made without a reasonable and competent inquiry." (Citation and quotation marks omitted).

To answer what it perceived to be this gap or open question in the law, DWT turned to equity.  And that instinct was valid.  As the Oregon Supreme Court stated long ago,

> Equity will not suffer a wrong without a remedy. Even the common law has a rule in near counterpart: Where law is, there is a remedy (*ubi jus, ibi remedium*). In a case made appropriate by the facts, equity looks to the substance and not the shadow, to the spirit and not the letter. Equity seeks justice rather than technicality, truth rather than evasion, common sense rather than quibbling.

*State ex rel. Tidewater Shaver Barge Lines v. Dobson*, 195 Or. 533, 577, 245 P.2d 903 (1952).  The Oregon Supreme Court made that statement in a case that is strikingly similar to this one in a number of respects.

In *Tidewater*, a barge operator filed a charge and sought an injunction from the NLRB to end a secondary boycott.  The NLRB responded that it could not review and respond to the charge for a few weeks, all the while Tidewater was losing $5,000 per day.  The barge operator then sought a TRO in Multnomah County Circuit Court.  The Circuit Court denied the motion on the ground that the NLRB had exclusive jurisdiction.  When the barge operator sought an alternative writ of mandamus, the Oregon Supreme Court reversed the decision below:

> If we adopt defendants' theory of exclusive federal jurisdiction in this matter, Tidewater will have no recourse but to stand idly by for an indeterminate period during the Board's investigation of its charge brought under § 160(a) and thereafter for a 'few weeks' more while the Board decides whether or not to petition the United States district court for a restraining order. …
>
> We are unable to believe that the Congress ever intended that such an intolerable situation should exist without remedy. To hold otherwise would give such recognition to a legislative hiatus between federal and state law that would thereby create a sort of judicial island in our national life untouched by either Congressional or state statute, a sanctuary to which the offending unions might safely repair with complete immunity while holding and harassing plaintiff and its business, or vice versa, a haven of protection wherein the employer might find refuge to unjustly and

Page - 17    DWT AND HUTCHESON'S OPPOSITION TO
SANCTIONS AND RESPONSE TO ORDER TO SHOW
CAUSE:  CASE NO. 6:21-CV-00304-MC

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

illegally exploit his employees to their determent or labor organizations to their destruction. Such is not consonant with the public policy of any state so far as we are advised, nor have we discovered any federal sanctions for such a practice. When any group, whether it be one of employer or employees, can find such a refuge beyond the reach of judicial control, we jeopardize our fundamental concepts of law and order and lay the foundation for privileged classes, inimical to the most cherished ideas of equal justice for all.

*When the National Labor Relations Board is impotent by its own confession to implement immediate aid, then we believe it is appropriate and necessary that our courts of equity take jurisdiction and apply such remedies as a hearing on the facts seems to dictate.*

*Tidewater*, 195 Or. 582–83 (emphasis added).  Again, we are aware of no U.S. Supreme Court case or statutory provision or amendment that speaks directly to this issue.[9]  A reasonably prudent lawyer could therefore conclude (as Mr. Hutcheson and DWT did) that there was a nonfrivolous basis to seek relief from an Oregon circuit court as DWT did here on behalf of St. Charles and that the removal of the state-court-filed case to this Court did not require a different result.

## C.     DWT Did Not Intend to Mislead the Court[10]

In hindsight, DWT recognizes that it should have addressed Section 10(j) and *Garmon* preemption expressly in its TRO Motion.  There was, however, no intent to obtain an illegal order or mislead the Court.

DWT sought "a temporary restraining order prohibiting any striking activity *until the board is able to reach a decision on this unfair labor practice charge* and take appropriate action."  TRO Mot. at 5 (emphasis added).  Although DWT did not initially cite Section 10(j), it repeatedly acknowledged the NLRB's authority and sought a narrow remedy that would both prevent irreparable injury and preserve the NLRB's jurisdiction.  *See id.* at 7 ("NLRB is tasked with determining whether [the Union]

---

[9] We also are aware of no Ninth Circuit, other circuit, or district court opinions that address this specific point.

[10] The Sanctions Motion is directed solely against St. Charles and not against DWT.  Nonetheless, inherent authority sanctions are not warranted against either St. Charles or DWT for the same reasons they are not warranted under § 1927: DWT (and St. Charles as DWT's client) did not intend to mislead the Court.  If the Court interprets the Sanctions Motion differently or would like DWT to respond further to the arguments made therein, DWT requests leave to supplement its materials.

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

complied with all notice requirements in issuing its March 4 strike notice."; *id*. at 9 ("given the tight timeframe imposed by the [Union's] non-compliant strike notice, it is unlikely the NLRB will be able to issue a ruling before the noticed strike date. An injunction here is St. Charles's only opportunity to avoid irreparable harm."); *id*. at 9–10 ("The NLRB will determine when [the Union] is legally permitted to strike. If [the Union] is permitted to commence its strike before the NLRB is able to issue its injunction, there is the potential for serious harm to the community."); *id*. at 10 ("this injunction is the only way to ensure that the proper authority, the NLRB, is able to consider the rule on this issue before actual harm is caused by the threatened strike."); *id*. at 10 ("St. Charles recognizes caregivers' right to engage in lawful strike activity and the authority of the NLRB over the notice issue raised here. St. Charles is simply asking that this Court ensure that the proper adjudicating body is able to complete its review and issue its decision in a meaningful way before the irreparable harm that would be caused by this (illegal) strike occurs.").

In other words, DWT's acknowledgement of Section 10(j) and *Garmon* was at least implicit (rather than knowingly or intentionally concealed) in DWT's repeated references to both the NLRB's authority and the narrow remedy it sought. Moreover, DWT attached the charge that it filed with the NLRB to its TRO Motion in which DWT references Section 10(j). Berry Decl. Ex. 2. And as this Court has recognized, "emergency motions such as this, where time is of the essence, often results in briefings that are less than perfect." Show Cause Order at 4. The timeframe in which DWT filed the TRO Motion, the supporting declaration, and complaint was particularly tight – about 80 hours from the time St. Charles unexpectedly received the strike notice, and approximately 24 hours from the time DWT learned that the NLRB could not act in time. In this brief period of time, DWT assembled a litigation team not previously involved in the underlying contract negotiations, including Mr. Hutcheson, to pull together these materials while simultaneously attempting to resolve the underlying labor dispute and assist St. Charles with strike preparations.

Page - 19    DWT AND HUTCHESON'S OPPOSITION TO
SANCTIONS AND RESPONSE TO ORDER TO SHOW
CAUSE:  CASE NO. 6:21-CV-00304-MC

#84143722_v5

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

### D.    DWT Did Not Violate Any RPC or 28 U.S.C. § 1927

In crafting the TRO Motion in the limited time available, DWT focused on explaining the reasons injunctive relief was necessary and appropriate, demonstrating the illegality of the Union's conduct and the emergency that St. Charles' patients faced.  And because DWT and Mr. Hutcheson were not seeking *ex parte* relief, the obligation to refer to that authority was not what it would or might have been in an *ex parte* situation.  *See, e.g.*, Oregon RPC 3.3(a)(2) (a lawyer shall not knowingly "fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel"); Oregon RPC 3.3(d) (noting additional duty with respect to disclosure of unfavorable facts in an *ex parte* proceeding).

The advocacy system functioned properly here.  The Union highlighted the jurisdiction/preemption issue in its opposition, and DWT explained the basis for its request to depart from the norm in its reply, in which it acknowledged *Garmon* preemption explicitly and argued that the Supreme Court permitted injunctive relief under narrow circumstances:

> In *San Diego Bldg. Trades Council, Millmen's Union, Local v. Garmon* ("*Garmon*"), 359 U.S. 236, 245 (1959), the Supreme Court specifically mandated that "[w]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board." However, the Supreme Court has since clarified—and limited—this principle in key respects. *See Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters*, 436 U.S. 180, 188 (1978) (explaining that *Garmon* "does not support an approach which sweeps away [local]-court jurisdiction over conduct traditionally subject to state regulation."); *see also Kaplan's Fruit & Produce Co. v. Superior Court*, 26 Cal. 3d 60, 67 (1979) (injunctions permitted to protect states' rights even when conduct complained of may constitute an unfair labor practice).

TRO Reply at 11.  DWT also presented the Court with the conundrum that St. Charles faced, and cited Section 10(j):

> Because the Board has said it will not be able to rule one way or the other before the March 4 work stoppage commences—and therefore will not be able to seek an injunction in federal court under 29 U.S.C. § 160(j) [a.k.a., Section 10(j)], if it decides in favor the Medical Center and issues a complaint—the Medical Center is merely asking to maintain the status quo, consistent with statute's plain language and

DWT AND HUTCHESON'S OPPOSITION TO
SANCTIONS AND RESPONSE TO ORDER TO SHOW
CAUSE:  CASE NO. 6:21-CV-00304-MC

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5

Congress' intent, until such time as the NLRB resolves the underlying issue. That is all.

*Id*. at 11–12. DWT did not try to obtain an illegal order.[11] DWT believed in good faith that a state court (where it originally sought relief) should and would be able to craft a narrow remedy for this once-in-a-century situation in the interest of the health and well-being of Oregonians who would suffer consequences as a direct result of what it believed was an illegal strike and St. Charles' inability to mitigate all of the health effects of that strike due to the pandemic.

Under 28 U.S.C. § 1927, sanctions may sometimes be appropriate for circumstances including intentional misrepresentations of the law. *Malhiot v. S. California Retail Clerks Union*, 735 F.2d 1133, 1138 (9th Cir. 1984) (misrepresentation of the record, quotation of a statute that was superseded three decades ago, and omission of material language in quoting statute "constitutes the requisite bad faith and intentional misconduct for which sanctions under Section 1927 are appropriate."). That is not the situation here, however. There were no such misrepresentations of the law.[12]

---

[11] DWT also acknowledged and responded in its TRO Reply to the Union's contention that the Norris-LaGuardia Act (29 U.S.C. § 107) precluded the TRO. *See* TRO Reply at 14-16 (arguing that "[t]he Norris-LaGuardia Act does not deprive a federal court of jurisdiction to issue injunctive relief for the reasons at issue here."). DWT further noted that Oregon's counterpart, ORS 662.010 *et seq*. would not preclude relief for similar reasons. *See id*. at 14 fn. 9 (arguing that ORS 662.010 is only applicable to lawful activities and citing *State ex rel. Tidewater Shaver Barge Lines v. Dobson*, 195 Or. 533, 570 (1952) ("Where picketing is for an unlawful purpose, no 'labor dispute' exists within the meaning of Oregon's anti-injunction act.")). Again, the advocacy system functioned properly here with the Union highlighting authority it believed applicable and DWT responding with the reasons it believed said authority did not apply in its reply.

[12] Although the Ninth Circuit may appear to have asserted in *Malhiot* that an intentional misrepresentation of authority may be grounds for sanctions under § 1927 by itself, that interpretation is not consistent with the plain language of the statute, which also requires multiplication of proceedings. Even assuming Mr. Hutcheson knowingly and intentionally omitted materially adverse authority (and he did not), he did not multiply the proceedings and so cannot be sanctioned under § 1927 for that reason as well. *Schmitzer v. Cty. of Riverside*, 26 Fed. Appx. 701, 703 (9th Cir. 2002) (no violation of § 1927 where attorney "caused only a single additional 'proceeding'—summary judgment" which "ended this case; rather than creating new questions or issues to be litigated, it resolved the underlying dispute. Thus, summary judgment did not 'multiply' the proceedings: it brought the case to a conclusion. We reject Riverside's argument that Schmitzer's claims were so meritless that the summary judgment process alone constituted an unnecessary multiplication of the

Page - 21    DWT AND HUTCHESON'S OPPOSITION TO
SANCTIONS AND RESPONSE TO ORDER TO SHOW
CAUSE: CASE NO. 6:21-CV-00304-MC

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR 97204
Telephone: 503.243.2300

#84143722_v5

**IV.    CONCLUSION**

As this Court recognizes, "emergency motions such as this, where time is of the essence, often results in briefings that are less than perfect."  Show Cause Order at 4.  This was a true emergency situation in the midst of a pandemic and in which DWT had to act with great speed in order to avoid what it and its client saw as a serious and irreparable threat to public health.  In aid of its attempt to help its client avoid this risk, it took a legal position which it believed was not foreclosed by prior case law – at least in the context in which DWT sought to apply that law.   Although DWT sincerely regrets giving any offense to the Court, DWT submits that this is not a situation in which sanctions are appropriate.

DATED this 19th day of May, 2021.

HOLLAND & KNIGHT LLP

By: s/ Peter Jarvis
Peter R. Jarvis, OSB #761868
E-mail: peter.jarvis@hklaw.com
Nellie Q. Barnard, OSB #122775
E-mail: nellie.barnard@hklaw.com
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300
Fax:  503.241.8014

*Attorneys for Davis Wright Tremaine LLP and Mark Hutcheson*

---

proceedings. Summary judgment is a common means of disposing of non-meritorious cases[.]"); *see also Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1189 (9th Cir. 2012) ("the district court quickly and correctly dismissed the claims barred by sovereign immunity at the outset of the litigation, so those claims did not vexatiously multiply the proceedings. Defendants conceded at oral argument that [plaintiff's] attorneys did not file repetitive motions or generate an extraordinary volume of paperwork in this case. We therefore reverse the district court's imposition of sanctions under § 1927").

Page - 22    DWT AND HUTCHESON'S OPPOSITION TO SANCTIONS AND RESPONSE TO ORDER TO SHOW CAUSE:  CASE NO. 6:21-CV-00304-MC

HOLLAND & KNIGHT LLP
601 SW Second Avenue, Suite 1800
Portland, OR  97204
Telephone:  503.243.2300

#84143722_v5